Mr. Schiff. Thank you, Your Honor. Your Honors, may it please the Court, this is FLO's appeal for Mendeparte's re-examination of U.S. Patent 6721178 to Clark. The re-exam concluded with the PTO ruling that claims 8, 35, and 40 were invalid as obvious in view of gross and certain other prior art. Counsel, speak up a bit for the benefit of the people in the back of the room. Certainly, I apologize, Your Honor. Some claims were allowed, is that right? That is correct, Your Honor. What was the general boundary line that the PTO drew between what they allowed and what they decided not to allow? Well, where the claims evinced a length-adjustable vertical beam, it was determined that the art relied upon didn't include that limitation. So what we're before the Court today on is what is conceded to be three means-plus-function claims, all of which share a common limitation, that being height-adjustment mechanism for altering the height of a horizontal tray. It's our position, to cut to the quick, that that language includes, as part of the corresponding structure from the specification, this length-adjustable vertical beam. What's the consequences, Counsel, of our agreeing with you? The consequences are, and as predicated on the PTO's admissions during the course of the re-examination, that all of the claims that are subject to appeal, and that we have canceled a few and likewise not appealed a few, will pass the issue. We'd ask the Court to direct the Patent Office to issue a re-examination certificate with respect to the claims identified in the conclusion. Well, I'm a little confused about that, because am I wrong that the examiner found the claims obvious? Several. Yes, sir, he did. And the board found the claims obvious, using a different theory? Correct, Your Honor. So, nowhere in the PTO have they held the claims patentable. So, assuming that we were to conclude, arguendo, that there was a vertical beam, wouldn't it have to go back to the PTO for re-assessment in terms of a different understanding or claim construction? Well, I don't think it would, and I'd offer two reasons for that, Your Honor. First, the examiner conceded throughout the course that, indeed, neither Gross, which formed the basis for his obvious disprojection, taught or disclosed a length-adjustable vertical beam. And likewise, with respect to the other rejection before the Court on today, an anticipation rejection predicated on Ergotron, that neither did Ergotron include a length-adjustable vertical beam. That is all part of the record in front of the PTO and the re-examination proceedings. In fact, Your Honors, one of the claims that was allowed, specifically Claim 2 of the original patent, refers to means and a mechanism for altering the height of the horizontal tray. What's the relevance of that to the question? Well, I say this because in the event that the examiner had determined that, indeed, any of the art upon which he was relying taught this vertical beam, this length-adjustable vertical beam, he certainly wouldn't have allowed Claim 2, then. So, you have allowed claims that are specific to the vertical beam, so is the idea that the broader claims to a height-adjustment mechanism will include other height-adjustment mechanisms? Well, it will certainly include height-adjustment. It will always include, I should say, I think as a result of it being corresponding structure, this notion of a length-adjustable vertical beam. I believe a review of the patent specification definitively shows that that certainly is always the word of the court that I'm looking for is, if I may just check my notes very quickly, I apologize. Our position is that with respect to at least the vertical beam, that aspect, the length-adjustable vertical beam, that that is, it actually operates to control the function, this notion of raising and lowering the horizontal tray. Well, that's your position. That's our position. We understand that. Yeah. And with respect to, on the other hand, various other mechanisms that are identified in the specification, a rack and pinion, a gas spring, assorted others, pin and hole, those certainly are available to be swapped out in the context of this means-plus-function claim. What if we hold it's not a means-plus-function claim, that the examiner was right and the board was wrong, then what? Well, I struggled with this issue and I thought that question might come up. Good, then you must have a good answer. I'm interested in your good answer. Well, first I think that certainly the Federal Circuit's precedent indicates that it is indeed a means-plus-function claim. Putting that aside. Putting that aside. I'm not so sure that we don't get back to the same place anyway, even under construction using the, let me put it this way, perhaps we get a different construction out of the patent office. You know, the broadest reasonable interpretation, but what we are obviously hoping to do in terms of where we are before the patent office is indicate and demonstrate to the patent office that these various limitations are indeed part and parcel of the claim, including, for example. Well, wouldn't your claim read directly, for example, on gross if it's not a means-plus-function claim? Because gross has, there are three ways of holding that horizontal tray and adjusting it. One is to have a sky hook from something in the air coming down like this. Another is to hold it from the sides or this way. And the third is the way your patent appears to hold it with a pole from the bottom. Now, if it's not a means-plus-function claim, all you have claimed is a height adjustment mechanism, which could be any one of those three, couldn't it? That's correct, Your Honor. In which case you read directly on gross. In which case you don't get a patent. In which case I'm out of luck. I just wanted to be clear that we all understood that that was the consequence of the means-plus-function issue. I think that's a fair assessment, Your Honor. Thank you. In the meantime. Can you distinguish the three alternatives? You only have two alternatives. Anyway, the judge-plaguer's view of the possibilities with the breadth with which your claim could be read, that's something you need to avoid, isn't it? In order to preserve the validity of your claims. I'm sorry, Your Honor. You need to avoid the prior art. We do need to avoid the prior art indeed, and we think we again have accomplished that. And you avoid it by claiming as a vertical beam. Correct. As part of the corresponding structure as a result of the claim limitation. But by arguing to us that your claims shouldn't be specifically limited to a vertical beam. Oh, I hope I'm not making that argument, because I certainly don't intend to. You want a height adjustment mechanism. I want a height adjustment mechanism for the function of altering the height of the horizontal tray. And as I read this specification, the only corresponding structure is this notion of a vertical beam that includes a mechanism. In other words, it's just a combination of elements. We're not talking about simply one structure that provides the function that we're talking about. We're talking about, in fact, just two. And that is, we go through the patent in gory detail. I'm sure we'd all enjoy it very much. I think beyond Ken, beyond question, that with respect to the patent, time and again, the use of the vertical beam in combination with some of the other mechanisms that are identified in the specification provides the structure by which the function, the claim function, which, incidentally, we in the patent office agree on, that is, altering the height of the horizontal tray, performs. But the vertical beam is the sole common and uniform element among those various iterations. That's correct. There could be the vertical beam in combination with the rack and pinion, the vertical beam in combination with the gas frame, the vertical beam in combination with the various other structures that are identified. If you thought there was a vertical beam, why didn't you mention it anywhere in your claim? Well, I suppose one answer to that may be because if we drafted it as a means plus function claim, adding a vertical beam would defeat the purpose. But aren't some of your allowed claims, or maybe all of them, specific to the vertical beam? There is an argument made with respect to claim differentiation in relation to Claim 8 and then Claim 16 and 17. But I would submit to you that if we took a look at Claim 16 and 17, we'd see that, in fact, Claim 16 and 17 aren't merely directed to a vertical beam. What they do and what they talk about are limitations in addition to the vertical beam, making way, for example, for power cords. So rather than simply adding the vertical beam, 16 and 17, incidentally, both depend on Claim 8, which is one of the claims. I think we've agreed that there's a claim that sort of is representative of 8, 35, and 40, and that is Claim 8, which includes this means plus function language, this height adjustment mechanism for altering the height of the horizontal tray. And if we look at it and compare that against Claim 16 and 17, we'll see that, indeed, 16 and 17, beyond specifically mentioning the vertical beam, also discuss wherein the chassis includes a vertical beam and a power cable connected to the power unit is routed inside the vertical beam. That's Claim 16. And then if we look to Claim 17, wherein the chassis includes a vertical beam and the vertical beam includes a shaft and a vertical beam cover and wherein a power cable. So we're further defining, then, the vertical beam that we believe is part and parcel of Claim 8 in the first place by dint of its big corresponding structure. Okay. Do you want to save the rest of your time for rebuttal? Please. Okay. Thank you. Thank you very much. Mr. Kraft. Mr. Kraft, may I please start? It seems to me your board put you in an awkward spot because by reversing the examiner and calling this a means plus function provision for the adjustment, what is it called, the height adjustment mechanism, they force us to look at the written description for structure. You would agree with me thus far? I would agree. I would disagree that it's a particularly awkward position. Okay. Good. You're going to help me understand why that's not so, and I'm happy if you will. It seems to me when you look at the structure and you look at the patent, you recognize, as I mentioned to Mr. Schuth, that there are three ways of making that horizontal tray work. One is the sky hook, you know, with a connector in the top of the tray and a floating hook, but nothing in the written description suggests they had that in mind. Another way is to hold it by the edges, the tray. Well, they can't mean that because then they run right into gross. And their own specification, which specifies that a pin and hole is arranged. So they must mean something coming up from underneath as a structure. That's what they would like to mean. That's not what the specification requires. What would you think, well, of those three ways of making the tray adjustable, which one do you think they're talking about? Are they talking about the sky hook? I don't see a reference to the sky hook in the specification. I do see a reference to the lateral holding notion from the pin and hole assembly. In other words, when you go to the specification on A74 where they give that list of alternative… But that could also mean the vertical beam because it could have a pin with an interior rod. I think that is correct. What do you do about the cable and pulley specification? That is, you need a very firm cable to hold it from underneath. And since we've eliminated the sky hook, the only way the cable… I'm trying to understand what the government's position is. The only way the cable could possibly work is if you had some sort of a vertical support from underneath that you could hook a pulley to. How do you envision the tray in the government's view of this patent? How do you envision the tray being supported? We can look at either Ergotron or Gross and say it reads on those for a number of reasons. Yes, there are vertical components in those references, but his whole basis for distinguishing those references, he said it a few times in this argument throughout this brief, is that it's a length-adjustable vertical beam. In other words, he's got the vertical beam coming out of his specific height-adjustment mechanism disclosed in some of his embodiments, the gas spring assembly, so the vertical beam itself changes. In Ergotron, yes, we can call it a vertical beam. In fact, the examiner did. You've got these vertical beams with holes in them, and then you just put the pins in the holes. That's enough to meet the claim here. You're suggesting that he wrote an application that was obvious from the beginning because he knew about Gross and he knew about Ergotron, didn't he? I think Ergotron he submitted to us at a relatively late date in this re-examination. I think Gross came out in the re-examination also. But on that very subject, it's worthwhile remembering the point of this invention was not the way of adjusting the height. If you read the background of the invention, he says, I've come up with an improvement over the old way that doctors did it. They'd have a terminal inside a cradle in the room, and they might get it lost or something like that. It's expensive to have a terminal in every room. Another option was wheeling a laptop around on a cart. He's got this newfangled idea of putting this display with a power supply, which solves some of the laptop problems and also solves the cradle problem. He doesn't talk about the tray. I guess my point is that he doesn't talk about the tray until that's the only limitation left standing. When he discusses his embodiments and the summary of the invention, the very beginning of it, I believe it's at A70 at the bottom, he talks about what this invention is, and the only thing he says about height adjustment is an adjustable height horizontal tray. When you look at that, you wonder, how does one adjust the height? Then you look elsewhere in the specification, and that's where it gives you this list. It could be a gas spring, it could be pinholes, it could be rack and pins. Is there any structure that the specification discloses to perform the function of raising and lowering the tray that does not include a vertical beam? I think one could even say that the ball screw mechanism that's disclosed doesn't include a vertical beam. The ball screw mechanism is horizontal, and the examiner, when he was rejecting this claim, said that's essentially the same as a lead screw mechanism, which is what we have in GROS. Yes, there's a vertical component that holds the belt up in the back of GROS, but that's not... But you're telling me, because I'm going to ask Mr. Shoup, the ball screw mechanism doesn't include a vertical beam. Not within the mechanism itself. I think as Judge Plager says, ultimately you need a vertical component somewhere to hold the rest of this up, but it's not necessarily a beam. It could be a wall or something like that. Remember, Mr. Shoup is trying to get us to find a length-adjustable vertical beam in this claim. If he can do that, then we don't have them with GROS or Ergotron. But that's what he needs to do, and you can see in his brief that's what he's trying to do, and he's not being successful in view of these other possible vertical beams in his specification. Even if he could convince us that there was a vertical beam... I want to come back to the question of what we do about 20 figures, all of which show a vertical beam. Even if he could convince us that they had in mind a vertical beam, wouldn't it still be obvious to try a vertical beam? To me, I think it probably would. It's very interesting that the examiner allowed Claim 2, and it's also very interesting that Mr. Shoup focuses on that because the allowance of Claim 2, which specifically says a length-adjustable vertical beam, that suggests that these other claims that omit that don't have it. But yes, I sit on a chair every day which has a length-adjustable vertical beam with a gas spring mechanism that allows me to go up and down. No skyhook. No skyhook. I'd like to thank you for just a couple of moments to the question that Judge Klager raised about using the word mechanism instead of means. Has the office changed the position that I thought it held for 100 years or so, that if you want a means-plus-function type claim, you must use the magic word means or else that's not your intention? We continue to maintain that is a presumption, but this, of course, cases in our more recent Section 112 guidelines, which we put out last year, suggest that terms like mechanism, unless they're surrounded by structural limitations, can invoke Section 112.6. Well, it's hard to tell from a case or two whether, in fact, all of the cases since at least the 1952 Act and for, I think, several decades before, said that this is how, if you want to bring in the structure in the specification and the equivalence, which was a concept specific to the means claims, you must use the word means and then we know what you're up to. You're abandoning that? We're definitely not abandoning it. You abandon it here? I don't think so. As I said, our guidelines recognize exceptions where the language is general, like the word mechanism is. If there's no structural limitation surrounding that, we'll say that's essentially means-plus-function. You must, therefore, when I say mechanism, you must treat it as if they use the word means? Well, our guidelines give the example of a detent mechanism. Never mind the guidelines. What is the official position of the office on this drafting technique that are used in hundreds of thousands of patents? If you use the word means-for, that requires Section 112.6 treatment. That's easy. But there are other cases where there is no structural limitation in the claim itself and it can be interpreted as 112. So here you have experienced patent attorneys knowing exactly what they're doing, knowing the rules and all else. They explicitly avoid using the word means, and nonetheless the office says, never mind, this is what we're going to do with it? On the facts of this case, that's not exactly what happened. Here the examiner says... Let's say the examiner got it right. Well, let's say the examiner was right and said that this is a very broad claim that's not means-for, then he found the prior art and that was the end of the game. It was a very easy case. It was only after the action closing prosecution that Flo decided, wait a minute, this is a means-plus-function claim, and then required us to address those arguments. The board agreed with him, but either way, I think our case is very strong. Flo argued the examiner was wrong. Excuse me? I guess I hadn't appreciated that from the brief. Flo argued the examiner was wrong in calling it a means-plus-function? I'm sorry, the examiner initially... In saying it's not a means-plus-function. Correct, and Flo persuaded the board otherwise, and now we're in the means-plus-function territory. I'm not going to reverse that standing here, but I do want to point out that if you think this is not a means-plus-function claim, that only makes it a broader claim, which is easily encompassed by the prior art. That makes your case a little easier. I would think so, yes. Wouldn't we have to send it back if we come to that conclusion? I think this is one of the cases where you can just read every limitation onto the reasoning that the board has already made. In other words, the board had to go through the means-plus-function analysis to find the equivalent structure in the specification here. If they don't even have to do that, they can go straight to the references and find the structure, and Flo doesn't dispute the references, disclose simple height-adjustment mechanisms, which is all the claims would mean. How in the world can a practitioner know what the rules are? The practitioner deliberately avoids the word means because there are a thousand cases that say that there's a distinction. Practitioners can be tricky as well, as in this case. They used the word mechanism. Perhaps they were holding on to the idea that they would ultimately call it a means-plus-function claim. Before the district court, they didn't even identify it as a means-plus-function claim. The examiner thought, well, that's got to be some kind of an estoppel. But now they come back at the last moment and say it is means-plus-function. I would put the blame for that on the practitioners as opposed to... It worked. In that case, we should compliment the practitioner for ingenuity. Exactly, but part of the problem is we have practitioners trying to be flexible in various different ways, and maybe our guidelines permit that. But again, if there's no structure identified in the claim itself, I think it's still appropriate to say, well, that can warrant means-plus-function. For purposes of this argument, you and the appellant both conceded that this was a means-plus-function claim. You, he, because it works in his favor. You, because that's what your board said. Now, let's assume we accept that it's a means-plus-function claim, but we look at the drawings and we consider the fact that there's no way for this horizontal tray to stay up absent magnetic possibilities, or sky hoops, none of which are in the claim. So we conclude hypothetically that there is a vertical beam called for by the structure built in. Then where are we? At most, you'd be at the place where the examiner was. In other words, you would have a vertical beam, but it would not necessarily be length-adjustable. In other words, it won't be the one that's being pushed up by the gas spring assembly. Well, let's assume we think it is. Then what? That it's length-adjustable? Yeah. In fact, the written description describes exactly what he thinks it does describe. Then what? If you were to say it describes only that, at that point, under that hypothetical, I think I might have problems. But I would urge you not to reach that conclusion just based on the way the beams plus function clause is, or the height-adjustment mechanism, is defined in the specification. It doesn't limit it to the gas spring assembly. The gas spring is the one that pushes up. No, it clearly doesn't limit it to the gas spring. It includes a pulley and cable mechanism. It includes a spin mechanism. There's a lot of different ways of adjusting that vertical beam. Well, let's give him that. Do you lose? No, but one of those that I like the best is the pin-and-holes one, because there the vertical beams are completely stationary, and all that gets adjusted is the height of the surface. The surface is held up by the pin, which goes into the vertical beam, which we'll call it, but the vertical beam is not length-adjustable. And so that's the very basis for the rejection under both Gross and Ergotron. They have this pin-and-holes arrangement. But it doesn't say a height-adjustment vertical beam. It says a height-adjustment mechanism, which could include a fixed beam with a pin in it. And the problem for him is that even if there's a vertical beam and it does include the fixed beam with the pin, then we win because we've got Gross and Ergotron. That's why you'll see in his brief, everywhere he argues it, it's a length-adjustable vertical beam. And that's why, you're right, he points to every one of his drawings, and admittedly, every one of his drawings have that gas spring thing with the length-adjustable vertical beam, but that's one embodiment. That doesn't account for the pin-and-holes assembly, which is clearly called for in that very part of the specification that references the height-adjustment mechanism. And again, I know it's boilerplate, I know it's at the end of the specification, but at the very end, they repeat the paragraph at the beginning which just says, this thing has a height-adjustable tray, and then it goes on and says, whatever we said before, those are just embodiments. The main invention is what we've described above, and that was this innovation in the healthcare field that improved over the cradle, terminal, and the pushing around the laptop. I see my time is up. It is. Is there anything else you must ask, Mr. Kraus? No. Thank you. Okay, Mr. Schiff, you have a couple of minutes. Almost a couple of minutes. I just want to address something very quickly, and I apologize. I was part of that district court proceeding, and I can tell you unequivocally the process that was involved. Again, will you speak up a little bit? Yeah, my apologies. I was involved in the district court proceeding, incidentally, and under the Northern District of Georgia rules, the manner in which claims are— the Markman hearings that take place is both sides—one side submits contentions, the other side either acknowledges that the element's there. The long and short of it is we never got to the point where we had to identify these elements as means plus function. So to the extent there's any suggestion at all of chicanery, I hope I can put that to rest. It was not at all us taking a different position with respect to whether or not this was a means plus function element in the context of the district court proceeding, or not taking that position, and then taking a different one here. I can just tell you that's not the case. And likewise, with respect to our initial arguments, at least presented for the Patent Office, what we advised the Patent Office as an initial matter, and our arguments directed to the first objections were, look, we believe and continue to believe today that these are indeed improper combinations. That said, getting back to the issue of the pin-in-holes arrangement, the way I envision a pin-in-holes, and perhaps improperly, is with one portion of the beam sliding over the other, and you slide a post in. A pin-in. A pin-in, I'm sorry. And that certainly suggests to me length adjustment, at least in the manner used in this patent. But you could also put pins in the side walls, much as many of us have in our libraries, where you have these rails that you have to put those silly little clips in that are constantly falling out. But that would work as well, wouldn't it? But that would read right on gross. Well, I'm not sure that I understand the judge's argument, and I apologize. It's not an argument. I'm not sure I understand the judge's question. What I would say is that, as I read this notion of a vertical beam in the context of the patent, at least, it's clear to me, again, looking at all the pictures, all the discussions around the CTL specification, including the summary, that in fact what we're talking about here is a device in which a vertical beam is employed with a variety of other mechanisms to perform the function of altering the height of the horizontal track. Can I ask one quick question? Sure. Just for clarification, does FLOW still exist? Actually, FLOW does. It does or does not? It does not. It does not. FLOW was a subsidiary of, standing alone a subsidiary of Emerson, which was then, in an effort of consolidation, swallowed by Intermetro, which likewise is a subsidiary of Emerson Electric Co. That's all in the identification. Thank you very much. Thank you, Mr. Schultz. Thank you very much. Thank you for your time. Thank you.